**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| TYRONE B. HUTCHINS, | ) 3:10-cv-00369-LRH-WGC |
| | ) |
| Plaintiff, | ) **REPORT & RECOMMENDATION** |
| | ) **OF U.S. MAGISTRATE JUDGE** |
| vs. | ) |
| | ) |
| NEVADA DEPARTMENT OF | ) |
| CORRECTIONS, et. al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

This Report and Recommendation is made to the Honorable Larry R. Hicks, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is Defendants' Motion for Summary Judgment. (Doc. # 73.)[1] Plaintiff has opposed the motion (Docs. # 79, # 81)[2] and Defendants filed a reply (Doc. # 83).[3]

After a thorough review, the court recommends that Defendants' motion be granted in part and denied in part.

///

///

---

[1]  Refers to court's docket number.
[2]  Doc. # 81 is Plaintiff's affidavit in support of his opposition.
[3]  Plaintiff also filed a sur-reply (Doc. # 87) which Defendants have moved to strike (Doc. # 88). The court has concurrently issued an order granting Defendants' motion to strike.

# I. BACKGROUND

**A. NATURE OF ACTION**

At all relevant times, Plaintiff Tyrone Hutchins was in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Am. Compl. (Doc. # 45).) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. §1983. The events giving rise to this litigation took place while Plaintiff was housed at various NDOC facilities; however, Plaintiff's action ultimately centers on health care provided at Northern Nevada Correctional Center (NNCC) and Ely State Prison (ESP) and his transfer from NNCC to ESP on September 29, 2009.

**B. DEFENDANTS**

Defendants are: (1) NNCC Dr. Karen Gedney; (2) NNCC Nurse David Everett; (3) former NDOC Director Howard Skolnik; (4) NDOC Director James Cox; (5) former NDOC Deputy Director Donald Helling; (6) NDOC Medical Director Dr. Bruce Bannister; (7) former Warden James Benedetti; (8) former ESP Warden E.K. McDaniel; and (9) former ESP Associate Warden Debra Brooks. (*See* Docs. # 45 (Pl.'s Am. Compl.), # 42 (Report & Recommendation re Pl.'s Mtn. for Leave to Amend screening the Am. Compl.), # 44 (Order adopting # 42), # 67 (Minutes granting Pl. leave to substitute David Everett for Jane Doe) and # 68 (Notice of Substitution).)

**C. SUMMARY OF MEDICAL EVIDENCE**

Plaintiff alleges that Defendants violated the Eighth Amendment when they transferred him to ESP despite knowledge of his heart condition and direct orders that he not be transferred from Carson City. (Doc. # 45.) First, the court will provide a description of the mechanism used by NDOC to classify inmates medically insofar as that process is relevant to a discussion of Plaintiff's medical history and allegations. Next, the court will likewise provide a description of

Administrative Regulation (AR) 608, which governs medical clearance for transfer of an inmate between institutions providing medical care, which is the subject of Plaintiff's action. Finally, the court will summarize Plaintiff's relevant medical history. Plaintiff's allegations substantially comport with the medical records produced by Defendants, and these facts are generally not in dispute. The court will point out any disparities between the allegations and medical records in the summary, and will include pertinent details from the records that were not included in Plaintiff's allegations but have not been disputed by Plaintiff.

**1. Medical Classification**

Defendants submit the declaration of Karen L. Walsh, the Health Information Director for NDOC. (Doc. # 73-1 at 2 ¶ 2.) Ms. Walsh describes the medical classification system at NDOC. Each inmate within NDOC is assigned a medical classification level I through IV, as follows: I (medically stable, requiring minimal to no periodic health care other than annual or biennial physical); II (medically stable with limited mobility requiring periodic examination); III (medically stable requiring routine follow-up care and periodic examination); IV (requires frequent intensive skilled medical or nursing care, as in the Regional Medical Facility (RMF)). (*Id*. at 2-3 ¶6.)

An inmate's health classification is recorded, initially, on the NDOC Initial Health Classification and Inmate Health Classification System Reclassification and Physical Documentation Form, and is updated each time an inmate sees an NDOC physician for a periodic physical examination, or any other time a physician determines the classification needs to be modified. (*Id*. at 3 ¶ 6.)

These forms also indicate any applicable medical restrictions. (*Id*. at 3 ¶.) NDOC utilizes the following medical restriction categories: (1) no restrictions; (2) housing limited to

3

institutions/facilities with or near health care capacity to treat limiting condition; (3) housing

limited to institution with health care capacity to treat limiting conditions; (4) restricted to RMF;

(5) work/program assignments limited due to functional limitations; (6) restricted from work

assignments in food services, health services and inmate stores; (7) no double bunk except with

inmate with same condition; (8) requires barrier free/flat ground facility for valid medical

reasons (no housing at NSP/HDSP); (9) not fit for fire suppression crew; (10) lower bunk only;

(11) lower floor/no stairs; (12) non-smoking cell medically necessary. (*Id*. at 3 ¶ 7.)

   The restrictions are updated at each periodic physical examination and any other time a

physician determines the restriction needs to be modified. (*Id*. at 4 ¶ 7.) Additional restrictions

not discussed above can be written into the form by the health care provider in the medical

narrative portion of the form. (*Id*. at 4 ¶ 8.) If a narrative is written, the next time the form is

updated, the physician must indicate on the form whether the prior narrative remains in place or

is being deleted. (*Id*.)[4] The narrative may be modified/removed when deemed medically

necessary by a physician. (*Id*.)

**2. AR 608**

   Defendants submit the version of AR 608 in effect during the time period at issue. (Doc.

# 73-1 at 23-26.) AR 608 discusses medical requirements for routine transfers of inmates

between institutions and provides: "[n]ursing and/or medical staff should be given at least

twenty-four (24) hours notice prior to routine transfers in order to evaluate either the inmate or

the inmate's medical record to assess suitability for travel and to prepare essential medications

and notify the receiving institution's medical staff of the transfer." (*Id*. at 24.) "Inmates being

---

[4] Defendants confirm that the narrative is not actually "deleted" from the inmate's medical file. The previous narrative remains a part of the medical file, but when a health narrative is "deleted" it means that the previously entered narrative(s) is/are no longer in effect. (Doc. # 83 at 3 n. 1.)

4

transferred from one institution to another where medical care is available must be cleared by a registered nurse or licensed practical nurse." (*Id*.)

### 3. Plaintiff's Relevant Medical History

#### i. 2005-2006

Plaintiff asserts that while he was housed at ESP in May of 2005, he suffered from serious heart complications which resulted in his emergent air transport to Valley Hospital in Las Vegas. (Doc. # 45 at 6.) From there, he was housed at High Desert State Prison (HDSP) in Indian Springs, Nevada. (*Id*. at 6-7.) While Defendants' submission of medical progress notes commences in 2006 and does not go back as far as 2005, a notation in the physician's orders section of their submission confirms Plaintiff's allegation (stating that Plaintiff was air lifted to a hospital from ESP on May 14, 2005). (Doc. # 74-1 at 78.) On June 21, 2005, he was transported back to ESP. (Doc. # 45 at 7.)

While back at ESP, in December 2005, Plaintiff was sent to ESP's infirmary when he was experiencing heart complications. (Doc. # 74-1 at 78.) As of February 27, 2006, his health classification was level III[5], with restrictions 2, 3, 9, and 12.[6] (Doc. # 74-1 at 17.) The previous narrative was deleted, and a new narrative was entered stating that it was preferable to have Plaintiff in a single cell because of cardiovascular disease, hypertension and myocardial infarction the previous month. (*Id*.) There was no change in his work status, and he was medically cleared for employment in laundry. (*Id*.)

On April 15, 2006, Plaintiff was noted as having elevated blood pressure. (Doc. # 74-1 at 55.) He was given medication and his blood pressure was monitored. (*Id*.) Later that month, he

---

[5]  Medically stable, requiring routine follow-up care and periodic examination .

[6]  2=housing limited to institutions/facilities with or near health care capacity to treat limiting condition; 3=housing limited to institution with health care capacity to treat limiting conditions; 9=not fit for fire suppression crew; 12=non-smoking cell medically necessary.

was transported to a local hospital for treatment for his heart condition. (Doc. # 74-1 at 78.) On April 19, 2006, an ESP nurse referred Plaintiff for admission to a cardiology clinic at NNCC due to his continuing heart problems. (Doc. # 74-1 at 78; Doc. # 74-1 at 22, 55.) Prior to his transfer, Plaintiff was seen by nursing staff at ESP who noted his elevated blood pressure and uncontrolled hypertension. (Doc. # 74-1 at 52-54.)

Plaintiff was transferred to NNCC and housed in its Regional Medical Facility (RMF) on August 24, 2006, where his heart condition was monitored and treated. (Doc. # 74-1 at 78.)

On September 7, 2006, after arriving at NNCC from ESP, Plaintiff's health classification was listed as level III[7], with restrictions 3, 5, 8, 9, 10, and 12.[8] (Doc. # 74-1 at 16.) The previous narrative was deleted and a new narrative was added, stating: "Keep at NNCC for medical reasons unstable heart." (*Id.*) Dr. Gedney's progress notes of the same date indicate Plaintiff's history of significant hypertension and angina. (*Id.*) Her stated plan was to get the hypertension under better control. (*Id.*) She also noted in the progress notes that Plaintiff should "stay North" and that he was "too unstable for ESP." (*Id.*)

A progress note entered by nursing staff on September 8, 2006, references an unusual occurrence "re: chest pain." (Doc. # 74-1 at 51.) Plaintiff is noted as being in the infirmary in a progress note dated September 11, 2006. (*Id.*)

A progress note dated October 2, 2006, states that Plaintiff was complaining of chest pain and an EKG was performed on October 3, 2006. (Doc. # 74-1 at 51.) Plaintiff was seen regarding his complaints on October 6, 2006. (*Id.* at 50.) On October 7, 2006, he reported minor chest

---

[7]  Medically stable, requiring routine follow-up care and periodic examination.
[8]  3=housing limited to institution/facilities with or near health care capacity to treat limiting condition; 5=work/program assignments limited due to functional limitations; 8=requires barrier free/flat ground facility (no housing at NSP/HDSP); 9=not fit for fire suppression crew; 10=lower bunk only; 12=non-smoking cell medically necessary.

discomfort to nursing staff. (*Id.*) As of October 8, 2006, he was no longer complaining of chest pain. (*Id.*) Plaintiff was seen again on October 10, 2006, where it was noted that Plaintiff had volatile hypertension, mostly secondary to stress. (*Id.* at 49.) The progress note states: "While pt. has been here his BP has been extremely well controlled b/c he's not stressed." (*Id.*) When he was seen on October 12, 2006, Plaintiff voiced no concerns. (*Id.*)

Plaintiff was discharged from the RMF on November 11, 2006, but continued to receive follow up care for his heart condition from Dr. Gedney and other doctors at NNCC. (*Id.* at 48.) As of November 16, 2006, his blood pressure was "very controlled" since he had been in the RMF. (*Id.*) He was described as "doing well" with "no chest pain." (*Id.*) At this time, Plaintiff's health classification was changed to level I[9], with restrictions 2, 5, 9, 10, and 12.[10] (*Id.* at 15.) The former narrative was deleted and a new narrative was added, stating: "No heavy work. If possible stay North b/c of heart problems." (*Id.*) The word "if" in the narrative was circled. (*Id.*)

There are no progress notes in the medical records submitted by Defendants for the months of December 2006 or January 2007.

### ii. 2007-2008

In February 2007, Plaintiff was transferred from NNCC to Nevada State Prison (NSP). (Doc. # 45 at 8; Doc. # 74-1 at 48.) A progress note dated February 19, 2007, indicates that Plaintiff reported to NSP staff that he was not supposed to be on the NSP yard and requested reclassification as he had experienced chest pain the day before. (Doc. # 74-1 at 48.) While there, Plaintiff was seen by NSP's Dr. Snyder. (Doc. # 45 at 8, Doc. # 74-1 at 46.) On February 23, 2007, it was noted that Plaintiff's blood pressure had increased since his arrival at NSP and it was

---

[9]  Medically stable, requiring minimal to no periodic health care other than annual or biennial physical.
[10]   2=housing limited to institutions/facilities with or near health care capacity to treat limiting condition; 5=work/program assignments limited due to functional limitations; 9=not fit for fire suppression crew; 10=lower bunk only; 12=non-smoking cell medically necessary.

recommended that he be classified to a flat yard. (Doc. # 74-1 at 46.) The same day, his medical classification was reflected as being level I[11], with restrictions 2, 5, 8, 9, 10 and 11.[12] (Doc. # 74-1 at 14.) Dr. Snyder deleted the previous medical narrative and added a new narrative, stating: "No heavy work. Needs flat yard. Keep in Carson City because of heart problems." (Doc. # 74-1 at 14; *see also* Doc. # 45 at 8.) Plaintiff was returned to NNCC. (*See* Docs. # 45 at 8, # 73 at 5.)

The medical records submitted by Defendants include no progress notes from the time Plaintiff was returned to NNCC until June 21, 2007.

On June 21, 2007, Plaintiff requested keep-on-person medications and Dr. Gedney approved this request. (Doc. # 74-1 at 46.)

On June 27, 2007, Plaintiff sent a request to Dr. Gedney stating that he had been working in the kitchen for forty-nine days, and got another job, but was told he needed her clearance before he could start. (Doc. # 74-1 at 89.) He requested that the number 5 restriction[13] be taken off so he could be cleared for the job. (*Id.*) On June 28, 2007, Plaintiff's medical classification was level II[14], with restrictions 2 and 9.[15] (Doc. # 74-1 at 13.) The previous narrative was deleted and no new narrative was entered. (*Id.*)

Plaintiff contends that Dr. Gedney, unbeknownst to him, deliberately deleted Dr. Snyder's prior health narrative which stated that Plaintiff should be kept in Carson City, as well as the health narratives she had previously entered stating that Plaintiff should remain in Carson City. (Doc. # 45 at 8-9.)

---

[11]   Medically stable, requiring minimal to no periodic health care other than annual or biennial physical.
[12]   2=housing limited to institutions/facilities with or near health care capacity to treat limiting conditions; 5=work/program assignments limited due to functional limitations; 8=requires barrier free/flat ground facility (no housing at NSP/HDSP); 9=not fit for fire suppression crew; 10=lower bunk only; 11=lower floor/no stairs.
[13]   5=work/program assignments limited due to functional limitations.
[14]   Medically stable, with limited mobility requiring periodic examination.
[15]   *See* n. 12.

On July 5, 2007, Plaintiff's health classification was level I[16], with restrictions 2 and 9.[17] (Doc. # 74-1 at 12.) There was no new narrative. (*Id.*)

Plaintiff was seen on November 1, 2007, and denied chest pain. (Doc. # 74-1 at 46.)

Between April 2008 and June 2008, Plaintiff was seen on multiple occasions regarding his hypertension. (Doc. # 74-1 at 43-45.)

On May 9, 2008, Plaintiff's health classification was level III[18], with restrictions 3, 5, and 9.[19] (Doc. # 74-1 at 11.) A new narrative was entered indicating that Plaintiff should be housed in Unit 3 or 10, if possible. (*Id.*)

On May 23, 2008, Plaintiff's medical classification was level III[20], with restrictions, 3, 5, 9 and 10.[21] (Doc. # 74-1 at 10.) The narrative previously in place was deleted and a new narrative was entered with a notation that Plaintiff should be kept at NNCC pending completion of his medical workup. (*Id.*)

Plaintiff was seen several times in July 2008, to have his blood pressure checked, and a progress note dated July 18, 2008, states that his blood pressure was "hugely improved." (*Id.* at 42.) On July 3, 2008, Plaintiff's medical classification was level III[22], with restrictions 3, 5, 9 and 10.[23] (Doc. # 74-1 at 9.) The narrative section adds "light duty only" with "no shoveling." (*Id.*)

---

[16]  Medically stable, requiring minimal to no periodic health care other than annual or biennial physical.
[17]  2=housing limited to institutions/facilities with or near health care capacity to treat limiting condition; 9=not fit for fire suppression crew.
[18]  Medically stable, requiring routine follow-up care and periodic examination.
[19]  3=housing limited to institution with health care capacity to treat limiting conditions; 5=work/program assignments limited due to functional limitations; 9=not fit for fire suppression crew.
[20]  *See* n. 18.
[21]  *See* n. 19 and 10=lower bunk only.
[22]  *See* n. 18.
[23]  *See* n. 21.

On July 14, 2008, his medical classification remained at level III[24], but with restrictions 3, 5 and 9.[25] (Doc. # 74-1 at 8.) There was no change to the narrative. (*Id.*)

Plaintiff's blood pressure continued to be monitored at NNCC in August 2008. (Doc. # 74-1 at 41.) A physician's progress note date August 18, 2008, states that Plaintiff's blood pressure was "controlled" and that Plaintiff was doing "extremely well." (*Id.*) The blood pressure monitoring continued through December 2008, and a progress note dated December 18, 2008, states that it had been "great for some time now." (*Id.* at 40.)

### iii. 2009

A progress note dated March 5, 2009, states Plaintiff reported feeling good and reflected that his blood pressure was also controlled. (Doc. # 74-1 at 39.) As of March 2009, Plaintiff's medical classification was level III[26], with restrictions 3, 5 and 9.[27] (Doc. # 74-1 at 7.) There was no change in the narrative.

Plaintiff's blood pressure continued to be monitored. (Doc. # 74-1 at 36-37.) Progress notes in May 2009 show blood pressure readings that appear to be in the normal range, but notes in June and July 2009, show elevated readings including 176/110 and 168/108. (*Id.*) Dr. Johns was notified. (*Id.*) As of June 12, 2009, Plaintiff's medical classification was level III[28], with restrictions 3, 5, 9 and 10.[29] (Doc. # 74-1 at 6.) The narrative portion of the form indicates that the previous narrative was deleted with no new narrative added. (*Id.*) Plaintiff was seen by a physician at NNCC on July 17, 2009, regarding his elevated blood pressure. (Doc. # 74-1 at 37.)

---

[24]   Medically stable, requiring routine follow-up care and periodic examination.

[25]   3=housing limited to institution with health care capacity to treat limiting conditions; 5=work/program assignments limited due to functional limitations; 9=not fit for fire suppression crew.

[26]   *See* n. 24.

[27]   *See* n. 25.

[28]   *See* n. 24.

[29]   *See* n. 25, and 10=lower bunk only.

In June 2009, while Plaintiff was still at NNCC, he was charged with a disciplinary infraction, and while he maintains his innocence, he was sentenced to eighteen months disciplinary segregation. (Docs. # 45 at 9, # 73 at 7.) The NNCC classification committee recommended to the offender management division (OMD) that Plaintiff be transferred to ESP to serve out his disciplinary segregation. (*Id.*) OMD approved the transfer on September 15, 2009. (*Id.*)

On September 28, 2009, Plaintiff's chart was reviewed by Nurse Everett. (Doc. # 74-1 at 36; Doc. # 45 at 10.) Plaintiff was cleared for transfer from NNCC to ESP and the clearance form notes his hypertension and that medications were being sent to ESP. (Doc. # 74-1 at 9, Doc. # 45 at 10.) Plaintiff arrived at ESP from NNCC on September 29, 2009. (Doc. # 74-1 at 36; Doc. # 45 at 10.) The form completed by ESP upon receiving Plaintiff also notes his hypertension. (Doc. # 74-1 at 92.)

Plaintiff maintains that NDOC's policy only requires medical clearance for transfer by a nurse, instead of a medical doctor. (Doc. # 45 at 10.) Plaintiff asserts that Nurse Everett knew from Plaintiff's "overall medical records" that he should not have been transferred back to ESP because of his heart condition. (*Id.*) He asserts this policy was promulgated by defendants Skolnik, Bannister, Helling, Cox, and Benedetti. (*Id.*)

Plaintiff claims that he notified defendants McDaniel and Brooks as well as medical personnel that he should not be transferred back to ESP; to no avail. (*Id.*) He includes a copy of a letter he sent to defendant Brooks on October 4, 2009. (Doc. # 79 at 14-16.) He advised her of his recent transfer from NNCC to ESP and of his "bad heart," "blood pressure problem" and medication restrictions 3, 5, 9, and 10. (*Id.*) He stated that he should be housed within fifty miles of a major medical facility, and represents that this restriction is contained within his medical

file. (*Id.* at 14-15.) He informed her that he had previously been to the hospital in Ely for problems related to his heart, and had to be airlifted out of Ely. (*Id.* at 15.)

Defendant Brooks sent Plaintiff a memorandum in response to his letter on October 7, 2009. (Doc. # 79 at 13.) She told Plaintiff his assignment to ESP was made by OMD, and that ESP "is located in an area with the services of [a] medical hospital. The local hospital can handle medical issues should they arise." (*Id.*)

As of October 14, 2009, Plaintiff's medical classification was level III[30], with restrictions 2, 5, 8 and 9.[31] (Doc. # 74-1 at 5.) The narrative in this medical classification form indicates a history of cardiac stents and unstable angina and makes note of a transfer to HDSP or Southern Desert Correctional Center (SDCC) for advanced heart disease. (*Id.*) The narrative also states that Plaintiff is "unstable for ESP." (*Id.*)

On October 15, 2009, a request for transfer to HDSP was submitted. (Doc. # 74-1 at 35.)

Plaintiff submitted an emergency grievance form at ESP on November 14, 2009. (Doc. # 79 at 18.) In this grievance, Plaintiff states that he has a restriction to be within fifty miles of a major medical hospital because of his heart condition, and references the fact that he has previously been airlifted out of Ely. (*Id.*) Plaintiff goes on to state that he saw a doctor at ESP on October 14, 2009, and the doctor ordered that Plaintiff be transferred closer to a major hospital because of his heart problem. (*Id.*) He says that this doctor told him his blood pressure was high and his heart was unstable. (*Id.*) He also notes that he informed his caseworker of this issue, to no avail. (*Id.*)

---

[30]   Medically stable, requiring routine follow-up care and periodic examination.
[31]   2=Housing limited to institutions/facilities with or near health care capacity to treat limiting condition; 5=work/program assignments limited due to functional limitations; 8=requires barrier free/flat ground facility (no housing at NSP/HDSP); 9= not fit for fire suppression crew.

On November 15, 2009, which is approximately a month and a half after Plaintiff was transferred to ESP, Plaintiff again suffered from heart complications and was emergency airlifted to Carson Tahoe Hospital in Carson City. (Doc. # 45 at 10-11, Doc. # 74-1 at 20, 35, 57-58.) This is confirmed by Plaintiff's medical records which state that Plaintiff was transported via air ambulance pursuant to the recommendation of Dr. Harris at the local hospital in Ely for treatment/observation. (Doc. # 74-1 at 35; *see also* Doc. # 74-1 at 20, 58.) Plaintiff was treated at Carson Tahoe Hospital and released and transported to NNCC on November 17, 2009. (*Id.*) He continued to receive treatment and monitoring at NNCC for his heart condition. (*Id.*) The discharge diagnosis from Carson Tahoe Hospital states that Plaintiff suffered from chest pain, shortness of breath, and uncontrolled hypertension. (Doc. # 74-1 at 99.) He was instructed to follow up with Sierra Nevada Cardiology. (*Id.*)

Plaintiff was seen at the infirmary at NNCC on November 17, 2009, post-discharge from Carson-Tahoe Hospital. (Doc. # 74-1 at 34.) There is a note that the nurse from Carson Tahoe Hospital informed the nurse at NNCC that an EKG and other tests performed all revealed results within normal limits. (*Id.*) Plaintiff denied having further chest pain on this date and was approved to be sent to the yard with instructions that his blood pressure should be checked daily for three days and he should follow up with cardiology. (*Id.*)

As of November 24, 2009, Plaintiff's medical classification was level III[32], with restrictions 3, 5, 9 and 10.[33] (Doc. # 74-1 at 4.) The narrative as of this date states that Plaintiff is to be kept in "CC" (presumably, Carson City) due to multiple medical problems. (*Id.*; *see also* Doc. # 79 at 24.)

---

[32]  Medically stable, requiring routine follow-up care and periodic examination.
[33]  3=housing limited to institution with health care capacity to treat limiting conditions; 5=work/program assignments limited due to functional limitations; 9=not fit for fire suppression crew; 10=lower bunk only.

**D. SUMMARY OF CLAIMS**

**1. Dr. Gedney**

Plaintiff's claim against Dr. Gedney is based on the allegation that she deliberately deleted restrictions against Plaintiff's transfer to ESP from Plaintiff's medical records. (*Id*. at 13.) He claims that this contributed to his eventual transfer back to ESP which resulted in his being airlifted to Carson Tahoe Hospital after he experienced heart-related issues at ESP. (*Id*. at 13-14.)

**2. Nurse Everett**

Plaintiff's claim against Nurse Everett centers on the allegation that Nurse Everett deliberately cleared Plaintiff to be transferred to ESP despite knowledge from his medical records of his heart condition and previous orders that he was to stay near Carson City. (*Id*. at 15-16.) He avers that the transfer led to his emergency airlift to Carson Tahoe Hospital for treatment for heart complications. (*Id*.)

**3. Skolnik, Dr. Bannister, Helling, Cox, and Benedetti**

Plaintiff contends that defendants Skolnik, Dr. Bannister, Helling, Cox and Benedetti promulgated and maintained a policy of allowing a nurse, as opposed to a qualified medical doctor, to conduct medical clearance procedures for the transfer of prisoners between institutions. (*Id*. at 17.) He alleges that this policy resulted in Nurse Everett clearing Plaintiff for transfer to ESP despite the fact that there were at least two physicians' orders that he not return to ESP as a result of his heart condition. (*Id*. at 18.)

**4. McDaniel and Brooks**

Finally, Plaintiff contends that defendants McDaniel and Brooks failed to take reasonable steps to expedite Plaintiff's transfer from ESP after they were notified of the medical restriction precluding his transfer. (*Id*. at 19-20.) Plaintiff asserts that this prolonged his stay at ESP and

1
2

resulted in his being emergency airlifted to Carson Tahoe Hospital for heart complications. (*Id.* at 20.)

3
4

**E. DEFENDANTS' MOTION**

5
6

Defendants move for summary judgment, arguing: (1) Dr. Gedney removed the medical restriction on Plaintiff's transfer after his health improved and conditions were stabilized;

7
8

(2) Nurse Everett cleared Plaintiff for transfer to ESP because it was consistent with the medical

9
10

restrictions assigned to Plaintiff by his physicians at the time; (3) defendants Bannister, Benedetti, Cox, Helling, and Skolnik, NDOC supervisors, are entitled to summary judgment

11
12

because there is no underlying Eighth Amendment violation and the policy alleged by Plaintiff was not so deficient that it was itself a repudiation of Plaintiff's constitutional rights or a moving

13
14

force of a constitutional violation; (4) defendants McDaniel and Brooks did not know of and

15
16

disregard a serious risk of harm to Plaintiff's health and any alleged delay caused by these defendants did not lead to further injury; (5) Plaintiff cannot recover monetary damages against

17
18

defendants sued in their official capacities; and (6) Defendants are entitled to qualified immunity. (Doc. # 73.)

19
20

**II. LEGAL STANDARD**

21
22

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

23
24

F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v.*

25
26

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if "the

27

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

28

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law." *Id.* (quoting Fed.R.Civ.P. 56(c)).[1] Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate.  *See Anderson*, 477 U.S. at 250. The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment.  Fed.R.Civ.P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co.  v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir.  2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

[1]Federal Rule of Civil Procedure 56 was amended in 2010 to state: "The court shall grant summary judgment if the movant shows that there is no genuine *dispute* as to any material fact and the movant is entitled to judgment as a matter of law." (Emphasis added.) The analysis under the cases cited, however, remains the same.

defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v.  S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec.  Indus.  Co.  v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc.  v.  Pac.  Elec.  Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not

significantly probative, summary judgment may be granted. *Id*. at 249-50, 255 (citations omitted).

### III. DISCUSSION

### A. EIGHTH AMENDMENT DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

A finding of deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's responses to that need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of

comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting *McGuckin* and finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical need is serious, the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id.* Inadvertence, by itself, is insufficient to establish a cause of action under § 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096) (This second prong...is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference.").

"Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment" or the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt*, 865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). In addition, it "may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, --- F.3d ---, 2013 WL 5813178, at * 9 (quoting *Jett v. Penner*, 439 F.3d 1091, 1096

(9th Cir. 2006), *overruled on other grounds by WMX Techs, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)) (internal quotation marks omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner-or between medical professionals-concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). Instead, to establish deliberate indifference in the context of a difference of opinion, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Id*. at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Preliminarily, Defendants do not argue Plaintiff does not suffer from a serious medical need, *i.e.*, his hypertension and heart-related issues. Therefore, the court's analysis will focus on whether their alleged conduct rises to the level of deliberate indifference to that need.

**B. DR. GEDNEY**

As noted above, Plaintiff alleges that Dr. Gedney violated his Eighth Amendment rights when she deliberately deleted Dr. Snyder's prior health narrative as well as her own narratives that Plaintiff was to be kept in the Carson City area because of his heart problems.

Dr. Gedney submits her own declaration in support of her motion for summary judgment. (Gedney Decl., Doc. # 73-1 at 8-11.) She relays Plaintiff's medical history relevant to her care. She acknowledges placing a narrative in Plaintiff's health classification form in September 2006 that Plaintiff should remain at NNCC because of his unstable heart (*id*. ¶6) as well as a narrative

in November 2006 that Plaintiff should stay North, if possible (*id*. ¶ 8). Dr. Gedney also recounts that Plaintiff contacted her in June 2007 to revise his medical classification form regarding his work status. (*Id*. ¶ 11.) Dr. Gedney acknowledges that Plaintiff only requested a modification of his work restriction, but maintains that his overall medical condition warranted a complete revision of his classification so she modified his classification to delete the restriction that prevented him from engaging in heavy work, as well as the restrictions that he be housed in Carson City. (*Id*. ¶¶ 11-12.) She contends the restrictions were no longer medically necessary in light of his improved health. (*Id*. ¶ 13.)

She concedes that Plaintiff returned to NNCC in November 2009, after being flown from ESP to Carson City, that he was diagnosed with chest pain, shortness of breath and uncontrolled hypertension, and that he was transported to the RMF at NNCC. (*Id*. ¶ 15.) She notes that the EKG, echocardiogram and stress test performed at Carson Tahoe Hospital came back within normal limits, and that when Plaintiff was returned to the RMF he was discharged to the prison yard. (*Id*.)

While Dr. Gedney states in her declaration that the reason she deleted the narrative that Plaintiff be housed in the North was because Plaintiff's health was stable and the restriction was no longer medically necessary, this reasoning is not documented anywhere in the medical records. Dr. Gedney does not address the fact that in February 2007, only some four months before she  modified Plaintiff's medical restrictions and deleted the narrative section of his medical classification form, Dr. Snyder  at NSP had noted that Plaintiff was experiencing chest pain and had elevated blood pressure and entered a narrative that Plaintiff should stay at NNCC because of his heart problems.

In addition, *her declaration* states that Plaintiff indicated he was having no *medical* problems when he made the request to have the number 5 restriction removed so he could work a particular job, but that is not an accurate reflection of Plaintiff's request, which states:

> Dr. Gedney, I've been working in the kitchen for the last 90 days. With <u>NO</u> problems. Now that I got another job (PI) I'm told that you have to clear me before I'm able to go to work. Can you please take the (5) ...up off of me. I really need this job. Thank you very much!

(Doc. # 23-1 at 15.)

It is not apparent that he was referring to his overall medical health or that he was stating he was experiencing no *medical* problems whatsoever. Even if this was true, Dr. Gedney knew of Plaintiff's history of uncontrolled hypertension. A jury could reasonably conclude that Plaintiff was simply stating he was not having issues working in the kitchen for the past ninety days, particularly when he was only requesting the removal of medical restriction five, which Defendants have identified as "work/program assignments limited due to functional limitations."

What is more, Dr. Gedney fails to address the fact that Plaintiff experienced medical issues related to his heart and hypertension in 2005 which required treatment at ESP, transport to the local hospital in Ely, and his being airlifted to another medical facility. Defendants did not produce the progress notes section of Plaintiff's medical file going back to 2005, but there is a reference in the physicians' orders noting Plaintiff was airlifted from Ely's hospital in 2005 (*see* Doc. # 74-1 at 78), and the court must construe the facts in favor of Plaintiff as the non-moving party. Thus, Dr. Gedney, as Plaintiff's treating physician in 2006, would have or should have known that Plaintiff previously experienced heart-related issues at ESP which required transport to a local hospital, and then emergent air transportation to another hospital. Coupled with the fact that Dr. Gedney herself had previously entered medical narratives restricting Plaintiff's housing to Carson City, the court finds that a jury could conclude that Dr. Gedney was deliberately

22

1   indifferent in removing the restriction as to where Plaintiff could be housed. A jury could

2   likewise conclude that this contributed to his eventual transport back to ESP, where he then

3   experienced exactly the same scenario as he had in 2005. Accordingly, the court recommends

4   that summary judgment be denied as to Dr. Gedney.[34]

5

6   **C. NURSE EVERETT**

7          Plaintiff contends that Nurse Everett violated his Eighth Amendment rights in September

8   2009, when he cleared Plaintiff for transfer to ESP when his medical records contained a record

9   of Plaintiff's heart problems and previous orders that he should be housed near Carson City.

10

11         Nurse Everett states that pursuant to NDOC policy, and specifically, AR 608, inmates

12  transferred between institutions where medical care is available, such as ESP, must be medically

13  cleared for transfer by a nurse. (Everett Decl., Doc. # 73-1 at 30-31, ¶ 4.) Prior to Plaintiff's

14  September 29, 2009 transfer to ESP, Nurse Everett reviewed Plaintiff's transfer report, including

15  his NDOC Medical Health Classification form. (*Id*. at 30 ¶ 5.) Nurse Everett states that NDOC

16  health classifications are determined by an inmate's physician. (*Id*. ¶ 6.) According to the

17  operative form at the time of Plaintiff's transfer, Plaintiff was classified as level III[35], with

18  restrictions 2, 5, 9, and 10.[36] (*Id*.)

19

20         According to Nurse Everett, ESP has an infirmary and complete medical staff, including

21  a physician; therefore, an inmate with  restriction 2 may be housed at ESP. (*Id.)* Restriction 5 is a

22  work restriction which does not preclude transfer to ESP. (*Id*.) Restriction 9 precludes an inmate

---

[34] The court notes that Plaintiff raises, for the first time in his opposition and affidavit, the argument that Dr. Gedney was deliberately indifferent to his serious medical need because she did not consult with a heart specialist regarding Plaintiff's condition. (Docs. # 79, # 91.) This allegation is also not part of Plaintiff's amended complaint; therefore, Dr. Gedney did not have notice of it when she moved for summary judgment and Plaintiff has not sought leave to amend in this regard. As such, the court will not consider this argument at this time.

[35] Medically stable, requiring routine follow-up care and periodic examination.

[36] 2=housing limited to institutions/facilities with or near health care capacity to treat limiting condition; 5=work/program assignments limited due to functional limitations; 9=no fire suppression crew; 10=lower bunk.

23

from working on a fire suppression crew, and has no bearing on a transfer to ESP. (*Id.*) Restriction 10 requires an assignment to a lower bunk, which allowed transfer to ESP. (*Id.*) Since none of these restrictions had a bearing on Plaintiff being transferred to ESP, Nurse Everett cleared Plaintiff for transfer. (*Id.*)

Nurse Everett acknowledges that Plaintiff's medical records in 2006 and 2007 included a restriction that Plaintiff remain in Carson City, but those restrictions were subsequently deleted by Plaintiff's physicians. (*Id.* ¶9.) There was a temporary restriction requiring Plaintiff to remain at NNCC in 2008, while a medical work-up was being completed, but this restriction was also deleted by a physician before Nurse Everett cleared Plaintiff for transfer. (*Id.*) Nurse Everett therefore deferred to the medical orders of physicians which indicated no restriction to the North in clearing Plaintiff for transfer. (*Id.*) He maintains that when he cleared Plaintiff for transfer to ESP, he had no knowledge of any significant risk to his health posed by the transfer. (*Id.* ¶ 11.)

Plaintiff does not provide any additional argument or evidence in his responsive brief concerning Nurse Everett.

The court finds that there is no evidence that defendant Nurse Everett was deliberately indifferent to Plaintiff's serious medical need. The court has recommended that a jury should decide whether Dr. Gedney's decision to delete the restriction that Plaintiff be housed in Carson City amounts to deliberate indifference in light of the facts described above; however, in clearing Plaintiff for transfer to ESP, Nurse Everett was deferring to the operative medical classification forms which had been determined by Plaintiff's treating physicians, and contained no restriction that would preclude a transfer to ESP. Nurse Everett was relying on the information contained in the medical records. There is no evidence that he knew of and disregarded a significant risk to Plaintiff's health. Therefore, summary judgment should be granted in favor of Nurse Everett.

24

1

2

**D. COX, SKOLNIK, HELLING, BENEDETTI AND DR. BANNISTER**

3

    **1. Allegations and Summary of Defendants' Argument**

4

    Plaintiff alleges that supervisory defendants NDOC Director Cox, former Director

5

Skolnik, former Deputy Director Helling, former Warden Benedetti, and Medical Director Dr.

6

Bannister violated his civil rights by promulgating or maintaining a policy that allowed a nurse

7

rather than a doctor to clear Plaintiff for transfer between institutions.

8

    These defendants argue that Plaintiff has failed to establish an underlying constitutional

9

violation, and as such cannot maintain a claim against these supervisory defendants. (Doc. # 73

10

at 15.) Even if the court finds a genuine issue of material fact exists as to the underlying Eighth

11

Amendment claims, these defendants assert they are nonetheless entitled to summary judgment

12

because Plaintiff cannot establish the medical policy at issue was so deficient that it was itself a

13

repudiation of a constitutional right or that it was the moving force behind a constitutional

14

violation. (*Id.* at 16.) Defendants contend this is the case because the policy is not closely related

15

to the ultimate injury. (*Id.*)

16

    In his declaration, Dr. Bannister, Medical Director of NDOC, states that in September

17

2009, NDOC policy required a nurse to clear inmates for transfer between institutions where

18

medical care is provided. (Bannister Decl., Doc. # 73-1 at 36 ¶ 4.) The nurse is responsible for

19

ensuring the inmate's TB testing is current, his prescribed medication is in order for the trip, and

20

that his health classification, as determined by a physician, is consistent with the transfer. (*Id.*)

21

Nursing staff reviewing an inmate's health classification for transfer are not authorized to modify

22

the physician-determined medical classification and restrictions, and instead defer to

23

determinations made by NDOC physicians. (*Id.* ¶ 6.) He states that the nurse is simply

24

interpreting physician's orders regarding appropriate housing for the inmate. (*Id.* at 36-37 ¶ 7.)

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2. Applicable Law

"'Under section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability.'" *Snow v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012) (en banc) (quoting *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989)). "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is 'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Id.* (quoting *Hansen*, 885 F.2d at 646).

The causal connection can include: "1) [the supervisor's] own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) conduct that showed a reckless or callous indifference to the rights of others." *Lemire v. Cal. Dep't of Corr.*, 726 F.3d 1062, 1085 (9th Cir. 2013) (citations and internal quotation marks omitted). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or should have known would cause others to inflict a constitutional injury." *Id.* (citing *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 2101 (Apr. 30, 2012)) (internal quotation marks omitted).

In addition, "[s]upervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of a constitutional violation.'" *Crowley v. Bannister,*---F.3d---, 2013 WL 5813178, at * 7 (9th Cir. Oct. 30, 2013) (quoting *Hansen*, 885 F.2d at 646) (internal quotation marks omitted).

Causation is essential to policy claim, as Plaintiff is asserting here against these defendants. *See Crowley v. Bannister*, --- F.3d ---, 2013 WL 5813178, at * 7 (9th Cir. 2013)

(citing *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012), *cert. denied*, No. 12-1296, 2013 WL 1808554 (Oct. 7, 2013)). In *OSU Student Alliance*, the Ninth Circuit stated: "Advancing a policy that requires subordinates to commit constitutional violations is always enough for § 1983 liability...so long as the policy proximately causes the harm—that is, so long as the plaintiff's constitutional injury in fact occurs pursuant to the policy." The Ninth Circuit expressly agreed with the Tenth Circuit, which held:

> § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor of her subordinates) of which 'subjects, or causes to be subject' that plaintiff 'to the deprivation of any rights...secured by the Constitution[.]'

*OSU*, 699 F.3d at 1076 (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)).

### 3. Analysis

First, Plaintiff has not submitted any evidence that these particular defendants— NDOC Director Cox, former Director Skolnik, former Deputy Director Helling, former Warden Benedetti, and Medical Director Bannister—created, promulgated, or implemented AR 608, which sets forth guidelines on the medical requirements for the transfer of inmates between NDOC institutions. A copy of the AR has been submitted by both Defendants (Doc. # 73-1 at 23-26) and Plaintiff (Doc. # 79 at 20-23). It is signed by former Director Jackie Crawford and former Medical Director Ted D'Amico. (*Id.*)

Second, even if we assumed that these Defendants could be said to have "in some other way possess[ed] responsibility for the continued operation of [this] policy," *OSU*, 699 F.3d at 1076 (internal quotation marks and citation omitted), there is no evidence that this policy is itself "a repudiation of constitutional rights" and is "the moving force [behind the] constitutional violation." In other words, the court would have to conclude that AR 608 in fact caused

Plaintiff's alleged constitutional injury. Here, it is not necessarily the case that the clearance for transfer by a nurse caused Plaintiff to suffer alleged constitutional injury. As the court pointed out, the moving force behind the constitutional violation may have been the deletion of the restriction that Plaintiff be housed in Carson City, and not the fact that he was cleared for transfer because at the time, no such restriction was in place. Moreover, as Defendants argue, Plaintiff cannot show that his situation would have turned out differently, *i.e.*, he would not have been transferred to ESP and ended up being transported back to another hospital, if a doctor had reviewed him for transfer instead of a nurse. As such, the court cannot conclude that AR 608 was itself a "repudiation of [Plaintiff's] constitutional rights" or that it was the "moving force [behind the] constitutional violation."

In sum, summary judgment should be granted to defendants Cox, Skolnik, Helling, Benedetti, and Dr. Bannister.

## E. MCDANIEL AND BROOKS

### 1. Summary of Argument

Plaintiff alleges former ESP Warden McDaniel and former Associate Warden Brooks violated his Eighth Amendment rights by failing to expedite Plaintiff's transfer out of ESP after Plaintiff advised them on October 4, 2009, that he needed to be housed within proximity of a major medical facility due to his heart condition.  He contends that a month later, he suffered major heart complications and had to be airlifted to Carson Tahoe Hospital, delaying medical treatment.

Defendants McDaniel and Brooks argue that neither of them has the medical expertise to make medical determinations relating to inmates and such decisions are made by NDOC medical divisions. (Doc. # 73 at 19.) According to McDaniel and Brooks, they knew that pursuant to

NDOC policy, Plaintiff was medically cleared to be housed at ESP and that his medical file was reviewed by ESP's medical department upon arrival, which was less than a week before Plaintiff asserts he sent the correspondence. (*Id.*) In addition, they maintain that Plaintiff's transfer to ESP was consistent with his medical classification at the time he sent the correspondence. (*Id.*) Finally, they argue that Plaintiff cannot demonstrate any delay resulting from his housing at ESP on November, 15, 2009, caused him further injury. *Id.* at 20. While Plaintiff was transported from ESP to Carson City following complaints of chest pain, they contend he cannot establish that the time it took to transport him to Carson City resulted in any harm. (*Id.* at 21.)

Defendant McDaniel states in his declaration that in June 2009, Plaintiff was placed in administrative segregation at NNCC pending a disciplinary investigation. (McDaniel Decl., Doc. # 73-1 at 33 ¶ 3.) He was ultimately convicted on the disciplinary charges and sanctioned to eighteen months in disciplinary segregation. (*Id.* ¶ 4.) According to McDaniel, as a medium custody institution and intake facility, NNCC has limited segregation bed space, and because of the length of Plaintiff's sanction and nature of the offense, he was transferred to ESP in September 2009. (*Id.*) At the time, defendant McDaniel was the Warden of ESP. (*Id.*) Defendant McDaniel does not recall receiving correspondence from Plaintiff on October 4, 2009, regarding his alleged need to be housed within fifty miles of a major hospital. (*Id.* ¶ 5.) However, since he is not a medical professional, it would have been his practice to advise an inmate to refer medical concerns to ESP's medical division. (*Id.* at 33-34 ¶¶ 5-6.)

Defendant Brooks, the former Associate Warden at ESP, provides an almost identical declaration. (Brooks Decl., Doc. # 73-1 at 40-41.) She states that she does not recall receiving or responding to correspondence from Plaintiff in October 2009. (*Id.* at 40 ¶ 3.)

In addition, defendants submit Plaintiff's responses to defendant McDaniel's interrogatories. (Doc. # 73-1 at 43-46.) Defendant McDaniel asks Plaintiff to state every fact supporting his contention that defendant McDaniel knew in September 2009 of Plaintiff's alleged serious medical condition and that his transfer to ESP in September 2009 posed a serious risk of harm to Plaintiff. (*Id*. at 43-44.) Plaintiff responds that he sent correspondence to defendants McDaniel and Brooks on October 7, 2009, notifying them of Plaintiff's serious heart condition and medical need to be housed at an institution within fifty miles of a major medical facility because he had previously been airlifted from ESP due to heart complications. (*Id*.)

Defendant McDaniel asserts in his reply memoranda that while Plaintiff presented evidence of correspondence with former Associate Warden Brooks, there is no evidence of correspondence with him. (Doc. # 83 at 7 n. 3.) Nonetheless, defendants McDaniel and Brooks maintain that as of October 4, 2009, when Plaintiff purportedly communicated with them, no one believed ESP to be an inappropriate place to house Plaintiff. (*Id*. at 7.)

### 2. Analysis re: defendant Brooks

Despite defendant Brooks' statement that she does not recall receiving correspondence from Plaintiff (Doc. # 73-1 at 40 ¶ 3), Plaintiff provides the letter he sent to defendant Brooks, informing her that he came to ESP from NNCC on September 29, 2009, and advising her of his heart condition and blood pressure issues, as well as her response. (Doc. # 79 at 13-16.) He specifically advised defendant Brooks that he had been to the local hospital in Ely on two prior occasions for heart-related issues, and both times had to be air lifted out for treatment. (*Id*.) He mentions an order that he is to be housed within fifty miles of a major medical facility. (*Id*.) In response, she states that his assignment to ESP was made by NDOC's OMD and that ESP is

located in an area with the services of a medical hospital which can handle medical issues should they arise. (*Id.*)

While the court acknowledges that defendant Brooks is not a medical professional, that does not necessarily mean she is absolved of potential liability under the Eighth Amendment. Plaintiff specifically put her on notice of the fact that he suffers from a serious medical condition and that he had previously been hospitalized in Ely, only two be air lifted to another medical facility. *See Snow v. McDaniel,* 681 F.3d 978, 989 (9th Cir. 2012) (finding that Warden McDaniel was not entitled to summary judgment where he received grievances advising him of the inmate's medical condition and reviewed orders related to the inmate's condition).

In fact, Plaintiff experienced health issues again just over a month after defendant Brooks sent her response to Plaintiff's letter, was transported to the local hospital in Ely via ambulance, and once again had to be air lifted out for care at Carson Tahoe Hospital. While an order requiring Plaintiff to be housed within fifty miles of a major medical facility may not have actually existed in Plaintiff's medical file at the time, defendant Brooks did nothing to investigate whether this was true or not at the time she received Plaintiff's letter.

While she is not a medical professional, she does not indicate that she contacted anyone in NDOC's medical department to determine whether such an order existed, or that she contacted any of Plaintiff's treating physicians to determine whether there was a reason Plaintiff should not be housed at ESP. Presumably, she could have even accessed Plaintiff's medical records herself or asked medical personnel to review them.  The medical records would have revealed that Plaintiff had experienced uncontrolled hypertension for most of the time period between 2006 and 2009, prior to his arrival to ESP, and that his condition had necessitated urgent care in the

past, at ESP, had required transport to the local hospital in Ely, and then air transport to a major medical facility.

Alternatively, defendant Brooks could have told Plaintiff to seek immediate medical attention so that ESP's medical department could determine whether a change should be made to his housing location as a result of any medical condition.

Defendant Brooks argues that she is entitled to summary judgment because Plaintiff cannot establish that any delay in transferring Plaintiff out of ESP led to further harm. Specifically, she states: "The medical records demonstrate that any delay caused by Plaintiff's housing in Ely, Nevada, and his subsequent transfer to Carson City, Nevada, led to no further injury. After being transferred to Carson Tahoe Hospital, Plaintiff underwent an EKG, an echocardiogram and a stress test that all were within normal limits." (Doc. # 73 at 20:28-21:1-4.)

Defendants are correct that where a delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060. However, their argument ignores the undisputed fact that Plaintiff was in medical distress at ESP such that he was transported from ESP to Ely's local hospital, and then air lifted to Carson Tahoe Hospital. It is obvious that Plaintiff did in fact experience further injury when a medical professional determined his condition was serious enough to warrant being sent from the prison to a local hospital, and then airlifted to a larger medical facility. This occurred just over a month after defendant Brooks responded to Plaintiff's letter warning him of this exact scenario. Thus, a question of fact exists as to whether Plaintiff experienced further injury as a result of the delay.

In sum, the court finds that Plaintiff has successfully raised a genuine issue of material fact as to whether defendant Brooks was deliberately indifferent to his serious medical need

1
2

when she merely responded to Plaintiff's letter that there was a hospital in Ely that could "handle

medical issues should they arise."

3
4

### 3. Analysis re: McDaniel

5
6

On the other hand, Plaintiff provides no evidence that defendant McDaniel had any

7

knowledge of Plaintiff's medical condition or that he otherwise knew of and disregarded a

8

serious risk to Plaintiff's health. Accordingly, summary judgment should be granted in favor of

9

defendant McDaniel.

10

## F. PLAINTIFF CANNOT RECOVER MONETARY DAMAGES AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES

11
12

Defendants are correct that "federal courts are barred by the Eleventh Amendment from

13

awarding damages against state officials acting in their official capacities[.]" *Snow v. McDaniel*,

14

681 F.3d 978, 991 (9th Cir. 2012) (citing *Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914, 918

15

(9th Cir. 2003)). Thus, summary judgment should be granted insofar as Plaintiff seeks to recover

16

damages against any defendant in his or her official capacity.

17

## G. QUALIFIED IMMUNITY

18

"Qualified immunity shields federal and state officials from money damages unless a

19

plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and

20

(2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-*

21
22

*Kidd*, 131 S.Ct.  2074, 2080 (2011) (quoting *Harlow v.  Fitzgerald*, 457 U.S. 800, 818 (1982));

23

*see also Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013) (citation omitted)

24
25

("Qualified immunity protects government officials from civil damages 'insofar as their conduct

26

does not violate clearly established statutory or constitutional rights of which a reasonable person

27
28

would have known*.");Padilla v. Yoo*, 678 F.3d 748, 758 (9th Cir. 2012); *Pearson v. Callahan*, 555 U.S. 223 (2009).

The request of defendants Everett, Cox, Skolnik, Helling, Benedetti, Dr. Bannister and McDaniel for qualified immunity is moot in light of the court's recommendation that summary judgment be granted in their favor.

Dr. Gedney argues that she is entitled to qualified immunity because Plaintiff cannot demonstrate she violated clearly established law when she revised Plaintiff's medical classification form to reflect his improved condition in June 2007. (Doc. # 73 at 23.) The court has determined that factual issues exist such that a determination of qualified immunity on Plaintiff's Eighth Amendment claim against Dr. Gedney is precluded at this time. *See Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003) ("If a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial.").

Defendant Brooks contends she is entitled to qualified immunity because no reasonable custody official would have known that there was an affirmative obligation to interfere with the medical department's determinations regarding transfer between institutions when the transfer was supported by the inmate's medical records. (*Id*.) However, in *Snow v. McDaniel*, the court held that Warden McDaniel was not entitled to summary judgment where he received grievances advising him of the inmate's medical condition and he reviewed orders related to the inmate's medical condition. *Snow*, 681 F.3d at 989. This is analogous to former Associate Warden Brooks' receipt of Plaintiff's letter which advised her of his medical condition, his previous health problems at ESP and the fact that this had previously required he be airlifted out of ESP to a larger medical facility. As it concluded with respect to Dr. Gedney, the court finds that factual

issues exist that preclude a determination of qualified immunity on Plaintiff's Eighth Amendment claim against defendant Brooks.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING IN PART AND DENYING IN PART** Defendants' Motion for Summary Judgment (Doc. # 73) as follows:

(1) Summary judgment should be **GRANTED** in favor of defendants Everett, Cox, Skolnik, Helling, Benedetti, Bannister and McDaniel;

(2) Summary judgment should be **DENIED** as to defendants Dr. Gedney and Brooks; and

(3) Summary judgment should be **GRANTED** to the extent Plaintiff seeks to recover monetary damages against the remaining defendants in their official capacities;

(4) The request of defendants Everett, Cox, Skolnik, Helling, Benedetti, Bannister and McDaniel for qualified immunity should be **DENIED AS MOOT**; and

(5) The request of defendants Dr. Gedney and Brooks for qualified immunity should be **DENIED** because of the existence of factual issues which preclude a determination of qualified immunity at this time.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

        2. That this Report and Recommendation is not an appealable order and that any notice of

appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

until entry of the District Court's judgment.

DATED:   November 27, 2013.


                                              _____
                                              **WILLIAM G. COBB**
                                              **UNITED STATES MAGISTRATE JUDGE**